IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ROBERT RAMIGE,                          )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )       CIVIL ACTION NO.
                                        )       05-0101-BH-B
McNEIL NUTRITIONALS, INC., et al.,      )
                                        )
            Defendants.                 )

**FINDINGS OF FACT; CONCLUSIONS OF LAW;**
**AND ORDER**

This action is before the Court on defendants' respective motions for summary

judgment (Docs. 34-39) and plaintiff's motion (Doc. 52) to strike the rebuttal affidavit of

Mary E. Matiya and exhibits attached thereto submitted by Tate & Lyle, Inc. ("Tate &

Lyle").  The Court has first considered plaintiff's motion to strike, together with Tate &

Layle's response (Doc. 54) in opposition thereto, and all other pertinent portions of the

record.  Based upon such consideration, and for the reasons stated by Tate & Lyle in its

opposition brief, the Court concludes that the evidence sought to be stricken is admissible

and it is therefore **ORDERED** that the motion to strike be and is hereby **DENIED**.  With

respect to defendants' motions for summary judgment, the Court has also considered

plaintiff's responses (Docs. 45-49) in opposition thereto, defendants' respective reply

briefs (Docs. 50-51), and all other pertinent portions of the record, and concludes that

defendants' motions are due to be granted in their entirety.

**FINDINGS OF FACT**

The Court has considered all the evidence of record, both testimonial and documentary, and finds that the following facts are undisputed or uncontradicted by the plaintiff:

1.      McNeil Nutritionals, LLC's ("McNeil"), a wholly owned subsidiary of Johnson & Johnson, hired the plaintiff, Robert Ramige, at age 50 as the sole packaging engineer for McNeil's McIntosh, Alabama facility ("McIntosh facility").  Nufrio Dep. at 43-44.  McNeil continuously employed Ramige from August 16, 1999 until the McIntosh facility was purchased by Tate & Lyle Sucralose, Inc. ("Tate & Lyle") on April 4, 2004. *Id.*  Ramige's supervisor at all material times was Richard Nufrio, who is three years younger in age than Ramige.

2.      In January 2002, Ramige had quadruple bypass surgery and was out on a medical leave of absence from McNeil for approximately three months. (Complaint, ¶10).  According to Ramige, he has also been treated for cancer, anxiety and depression and had back surgery "over the years." (*Id.*)[1].

3.      On February 19, 2002, while Ramige was out on disability, he sent an e-mail to several coworkers which, he concedes "contained inappropriate comments."

---

[1]Ramige asserts in his complaint, immediately following his statement concerning his past medical and psychological treatments, that "Plaintiff's employer was aware of Plaintiff's medical condition and regarded Plaintiff as having a disability." (Complaint, ¶ 10).  Although it is unclear whether plaintiff's contention regarding McNeil's awareness relates to Ramige's past medical history or his condition following the bypass surgery, the Court must assume it relates to the latter inasmuch as the discrimination claims asserted in this lawsuit are alleged to have arisen only after his bypass surgery.

Opposition Brief (Doc. 45) at 6.  Ramige subsequently  sent an apology e-mail which was forwarded to Nufrio.  However, Mike Young, the plant manager, directed Nufrio to "document the e-mail that [Ramige] sent while he was recuperating into [Ramige's] record."  Opposition Brief (Doc. 45) at 6, citing Nufrio Dep. at 93.[2]

4.      Ramige returned to full employment as the plant's packaging engineer in May, 2002.[3]  Ramige claims that the discrimination at issue in this litigation began after his return.  Ramige testified that the only individual at McNeil he believes "regarded him" as having a disability was his supervisor, Rich Nufrio.   Ramige Dep. at 115.

5.      On May 7, 2002, Nufrio met with Ramige to review Ramige's performance for the previous year.[4]  Opposition Brief (Doc. 45) at 7.  Ramige complains that Nufrio's attitude toward him had "completely changed" and that "Nufrio brought up a number of

_____

[2]Mike Young specifically advised Nufrio and Sorg: "We need to keep this as documentation of several unacceptable unprofessional behaviors by [Ramige].  Profanity in a company document, references to drug use, general negative characterization of the work place. All these going in an e-mail that is read by co-ops."  Opposition Brief (Doc. 49) at Exh. D, doc. 000069.

[3]Ramige complains that "[o]n April 21, 2002 Nufrio sent an email to his staff, including Ramige, with a listing of Goals & Objectives assignments for 2002 [but] Ramige was omitted from any assigned Goals & Objectives."  Opposition Brief (Doc. 45) at 6.  Ramige has failed to provide, however, any evidence that he had actually received "approval from his physician to return to work" and/or conveyed same to Nufrio or anyone else at McNeil prior to April 21, 2002.

[4]Ramige complains that "Nufrio did not review any other employees under his supervision at this time."  Opposition Brief at 7.  Ramige previously acknowledged, however, that "McNeil originally reviewed employees annually on the employee's hire date [but that] [t]he review process was changed in 2002 to a calendar year review."  Opposition Brief at 5.  Ramige proffers no evidence that any other employee under Nufrio's supervision was in fact due to be reviewed on May 7, 2002.

issues that Ramige did not agree with and that they had never discussed before." *Id*.[5]

Ramige has proffered no evidence, however, that Nufrio regarded him as **substantially**

**limited** in any life activity or even incapable of improving his job performance.   In fact,

according to Ramige, "[t]he outcome of the May 7 meeting was for Ramige to put

together a plan for self-improvement that detailed how he was to meet the expectations."

Opposition Brief (Doc. 45) at 8.  Ramige testified that Nufrio never expressed

dissatisfaction with his performance outside his evaluations, never discussed his medical

condition or health, never made him feel he was disabled with respect to his ability to

function as a husband or to do his hobbies, and that Nufrio confined his comments to

Ramige's particular job as packaging engineer.  Ramige Dep. at 117-119.   Ramige

specifically conceded that Nufrio did not "ever say or do anything that made [me] feel [I

was] being regarded as disabled beyond [my] ability to do [my] job as a packaging

engineer." *Id*. at 146.

     6.     Ramige also complains that his 2002 Review, dated March 6, 2003,

"surprised [him] as he was under the misconception that 2002 was a pretty good year."

Opposition Brief (Doc. 45) at 8.   Ramige was given a "4" during this review.   Ramige

contends that, with respect to one of his 2002 objectives which was to "upgrade the

AllFill micronizer," Nufrio stated that "delays took place due to health reasons." *Id*. at 8-

---

[5]During his first performance evaluation following his return to work, Ramige was advised by Nufrio that "he was being given a written reprimand for the email of February 18, 2002." Opposition Brief (Doc. 45) at 7.  Although Ramige initially appears to complain that "no written reprimand was ever given" (*Id*. at 7), he later acknowledges that his reprimand came in the form of a 1 % reduction in the bonus subsequently due (*Id*. at 10).

9.  Ramige faults Nufrio for failing to mention delays allegedly caused by "problems with the conveyor belt of the machine."  *Id*. at 9.  In addition, Ramige conceded during his deposition that, although nothing with his health condition had effected his ability to do his job, "I took quite a few days off to see doctors."   Ramige Dep. at 122.  Again, the evidence of record demonstrates only that Nufrio challenged Ramige's job performance, not his ability to perform his job.

7.      Ramige sent a memo on March 12, 2003, to Dave Sorg, McNeil's Human Resource Manager, and Nufrio "that responded to each issue raised in the [2002] review." Opposition Brief (Doc. 45) at 9.  Ramige contends that this memo constituted his first formal complaint of discrimination merely because he therein stated that Nufrio "certainly has viewed me in a different light since my disability."  *Id.* at 9-10, *citing*, Exh. B at doc. 00243; Exh. D. at doc. 00136.  However, no reasonable juror upon review of this memo could find that Ramige had made any complaint about being perceived to be disabled or incapable of performing his job by Nufrio as opposed to finding that Ramige simply disagreed with Nufrio's perception of the level of his performance.  In addition, as of April, 2004, Ramige performed all aspects of his job as packaging engineer, and his general responsibilities had not changed.  Ramige Dep. at pp. 41, 199.

8.      Ramige also argues that, following his performance review dated March 6, 2003, his 2003 bonus was reduced by 1% based on the e-mail he sent during his disability leave.  Opposition Brief (Doc. 45) at 10.  Although he complained to Sorg that he believed he was being punished by Nufrio, Ramige acknowledged in the same

5

memorandum to Sorg that, according to the company's website: "All cash bonus awards

are entirely discretionary and are *based* *on* *performance*."  *Id*., *citing*, Exh. B, doc.

000087 (emphasis in original).   Ramige does not deny that he nonetheless received a

bonus albeit reduced by 1%.   And, as stated previously, Ramige has conceded that the

subject e-mail "contained inappropriate comments."  Opposition Brief (Doc. 45) at 6.

   9.  With respect to Ramige's 2003 performance review dated February 17,

2004, Ramige again received an overall rating of "4"  but contends only that "it was quite

a surprise" that Nufrio "attributed the completion of Ramige's projects to coops,

administrative help and mechanics."  Opposition Brief (Doc. 45) at 10.  What Nufrio was,

in fact, addressing in that portion of the Performance Evaluation entitled "Development

Opportunities" was:

> Establishing Priorities and meeting deadlines – The list of projects
> completed in '03 consists are [sic] primarily smaller scope
> complexity (most completed by coops, administrative help and
> mechanic)
> Other projects of high importance to the unit (All-Fill,
> Oversize, Check Weigher Printout utilization, Powder Room
> working environment) don't receive the level of interest and
> follow-up they require.

Nufrio Dep. at Exh. 3, § D.  Ramige has again proffered no evidence that Nufrio

considered Ramige physically or otherwise incapable of performing his job.  In point of

fact, in the 2003 performance review dated February 17, 2004, Nufrio identifies the

following "Strengths" he attributed to Ramige:

- Customer/Marketplace Focus - Bob has demonstrated a much more receptive and helpful attitude toward customer inquiries and complaints.

- Interdependent Partnering - As part of the "path forward plan" improvement in partnering was identified. Bob demonstrated improvement in this area in '03 working with H.B. Taylor to resolve the spare parts issues, with Purchasing to bring the new 1 gal bottle supplier online and with Customer Service when addressing customer requests.

  I received feedback from several of his co-workers indicating positive change.

- Organizational and People Development - In '03, Bob made himself more available to the floor, got involved in helping technicians with working on their goals, worked well mentoring the co-ops, and acknowledged performance that warranted recognition. These activities will be instrumental in restoring credibility and trust.

- Job Knowledge - Through the network of associates Bob has developed, he stays current on latest technology. Bob has done more to share his knowledge with technicians, mechanic, and co-ops than previously observed.

- Establishing Priorities and meeting deadlines -One area Bob was asked to improve in was project execution and documentation. Bob has continued to hold weekly project meetings to establish appropriate priority to the list of activities the technical group is attacking. In addition, Bob has provided timelines for certain projects. For projects closed out, appropriate documentation was completed.

- Utilize expertise in recommending operation and maintenance of operating packaging lines - This was one of the areas identified in the "path forward plan" that Bob needed to address. The deficiencies were addressed. The PM program for the F/P area has two components: a quarterly agreement with SPM to provide an outside look at the packaging equipment, and an in-house PM program exercised by on-site maintenance. Both components were active in '03.

*Id.* at §§ C and D.  Although Ramige asserts that "[a]t the discussion of the review things became heated . . . [and] both Nufrio and Ramige used profanity," Ramige does not contend that this argument related to any health or physical capacity issues.  Opposition Brief (Doc. 45) at 10-11.   According to Ramige: "The day after the review meeting Ms. Harris (new HR manager) called Ramige down to her office and explained to Ramige that his behavior during the review was inappropriate and that this was a very serious offense. *Id*. at 11.  Harris also advised Ramige that "she wasn't sure what the disciplinary actions would be." *Id.*  Ramige admitted this offense to Harris but informed her that "Nufrio had also used inappropriate language during the review." *Id.*  Ramige was thereafter on March 15, 2004, given a written warning concerning the inappropriate language. *Id.* Ramige concedes that, although he could have been, he "was not put on probation, suspended without pay or terminated." *Id*. at 12.

10.     Ramige also complains that, after advising Nufrio and Harris about an upcoming doctor's appointment, "Harris responded with a critical e-mail telling Ramige that he did not have to inform her of his medical appointments."  Opposition Brief (Doc. 45) at 11.  However, even if relevant to Ramige's discrimination claims, no reasonable juror could conclude that Harris's response was "critical" as opposed to merely answering the following question contained in Ramige's e-mail:

> I need clarification - should I be using sick days for doctor visits, personal days, or should I continue to use vacation days for doctor visits. Just let me know the policy so I can follow it. [and] I would like to take a vacation day this Friday, March 19th.  I have a meeting with my attorney.  Let me know if that's O.K.

*Id*. at Exh. D, doc. 0000102.  All Harris said to Ramige in response was:

> Bob
> First just wanted you to know that there is no need for you to inform
> us re the details of your medical appointments; if needed this should
> be directed to our nurse Darin Lastrapes; he can be reached at (904)
> 443-3330.  As for how to charge time off, you should just inform
> your manager of need to go to dr. appointment - not details and then
> insure it is ok and take the time.  It can be charged as personal time.
> As you know your pay is not adjusted for such time to take care of
> medical appointments; however, you need to work with your
> manager to schedule.
>
> As for vacation, again it is not necessary that you let us know why
> you are taking vacation.

*Id*. at Exh. D, doc. 0000103.

11.     Ramige made a complaint to the compliance line of Johnson & Johnson

(J&J), McNeil's parent corporation, following the 2004 performance review.[6]  Opposition

Brief (Doc. 45) at 12.  This complaint was investigated by Carol Peccarelli, who is

identified as "Vice President, Human Resources, McNeil Nutritionals" with an address in

"Fort Washington, PA."  *Id*. at Exh. B, doc. 0000216.   After discussions with Nufrio,

Harris, Ramige and Young and reviewing documents, Peccarelli concluded as follows, in

a document dated April 6, 2004:

> [T]here is no evidence to substantiate Bob's allegation that named
> individuals treated him in a discriminatory manner.  His performance
> review and scores are well-grounded in objective criteria.  There
> was, however, a definite lack of performance feedback

---

[6]Ramige does not specify the exact date on which he made this complaint.  The evidence
of record appears to indicate that this complaint was made on March 4, 2004 at 11:07 am.  *See*,
McNeil Reply (Doc. 51) at Exh. 1, Alertline Confidential Memorandum, doc. 000129.

> communication directly to Bob, as the monthly meetings between
> Rich and Bob did not take place.

*Id*. at Exh. B, doc. 0000215.

12.     Although Ramige complains that Harris had indicated that "a 4 performance

rating . . . at the McIntosh Plant is generally reserved for the lowest performers," she also

indicates in the same document that "this still means meeting standards." Opposition

Brief (Doc. 45) at 12, *citing*, Exh. B, doc. 0000145.  This rating is also discussed by Carol

Peccarelli in her investigation report:

> In March 2003 Rich met with Bob to conduct the performance
> review.  Four of the seven objectives were not met and below
> standard behavioral examples were cited in the performance review.
> The objectives were set with input from Bob and were realistic and
> achievable.  Bob's performance in 2002 was borderline, and Rich
> gave him the benefit of the doubt and rated him a 4, **which is
> "performance that has generally achieved job standards."**  This
> rating is competent and did not require Bob to be placed on
> probation.  At no time has Bob been placed on probation.

*Id*. at Exh. B, doc. 000214 (emphasis added).  In addition, Ramige does not dispute

McNeil's contention that "[s]ixty-five percent of McNeil employees fell within the same

4-6 rating received by Ramige."  McNeil Proposed Facts (Doc. 38 ) at ¶ 7.

13.     Ramige filed a formal EEOC complaint against McNeil Nutritionals on

March 29, 2004.  Opposition Brief (Doc. 49) at Exh. B, doc. 000107.  Notice of this

charge was not sent to McNeil by the EEOC until April 20, 2004, and was addressed to

McNeil at the McIntosh plant long after said plant was taken over by Tate & Lyle. *Id*.

Consequently, the notice was faxed from the McIntosh plant by Tate & Lyle to McNeil

on the day it was received.  *Id*. at doc. 000108-115.  No evidence has been proffered that anyone at Tate & Lyle read this EEOC charge beyond the section identifying the intended recipient, namely McNeil.

14.     Ramige asserts that he "sent an e-mail to Karen Harris, Nufrio, and Carol Peccarelli, corporate HR for J & J, stating that he wanted to pursue an opening at Alza, an affiliated plant, for Manager of Packaging Engineering."  Opposition Brief (Doc. 45) at 13.  This email was dated March 30, 2004.  *Id.*   Ramige intimates that his "request was denied" because "[t]he email also indicated [he] had filed a formal charge of discrimination with the EEOC."  *Id.*, *citing*, Exh. D, doc. 000155.  The email in question, however, not only informs the recipients about his alleged application but acknowledges that the position at issue is actually not yet available:

> I was automatically sent a career opportunity at Alza Corporation, part of J&J.  This is for Manager of Package Engineering.  Although I am aware that **all opportunities within J&J are on hold during this transition and for some time in the future**, I applied for this position – it appears to be a very good fit.  Hopefully, we can all work out our current differences at this facility, but this would be an alternative that might work for all parties.  Yesterday, my attorney filed formal charges with the EEOC for discrimination based on age and disability.  I plan to go forward with this; however, I am open to negotiations that might benefit all of us.  This opportunity would be a good starting point for discussions.  My only concern and motivation for any actions I have taken has been for the financial security of my family.

*Id*. (emphasis added).  The reference in this email to Ramige's having filed an EEOC complaint also bears no relation to the denial of Ramige's application for the Alza position because Ramige has proffered no evidence that Harris, Nufrio or Peccarelli, had

any authority to appoint him to the position of Manager of Package Engineering at the

Alza Corporation or in any manner participated in that selection process.  In addition,

Ramige has failed to dispute the evidence proffered by McNeil that:

> Ramige's answers to the [application] questionnaire showed he
> possessed one (1) to two (2) years of pharmaceutical packaging
> experience.
>
> A minimum of three (3) to five (5) years . . . was required [and]
> [t]hree (3) other applicants possessed at least the minimum number
> of years of pharmaceutical packaging experience required.
>
> These three candidates were selected for the first round of interviews
> [and] One was ultimately selected for the position so no further
> applicants were interviewed.

Cunningham Aff. (Doc. 39-3), Exh. 17 at ¶¶ 8-10.  Ramige has also failed to proffer any

evidence that this position was filled by someone younger than he or under circumstances

from which it could be inferred that the appointment represented McNeil's discrimination

or retaliation against Ramige.

15.     Ramige complains that he did not voluntarily resign from McNeil and that

he was not given the opportunity of remaining employed by McNeil, all while

acknowledging that McNeil was taken over by Tate & Lyle.  Opposition Brief (Doc. 45)

at 13.  Ramige had, however, specifically conceded from the outset that he "was

employed by McNeil from August 16, 1999 until the takeover by Tate & Lyle on or about

April 3, 2004."  *Id*. at 4.  The evidence of record indeed establishes that, immediately

before the sale of the McIntosh facility, Ramige sought and gained employment with Tate

& Lyle.  Ramige Dep. at 36 (confirming that he "had to reapply for employment with

Tate & Lyle" and that "everyone received a package of forms they needed to fill out."). As of April 4, 2004, Ramige employment relationship with McNeil ceased because of Ramige's voluntary decision to work as a packaging engineer for Tate & Lyle. *Id.* at 37 (confirming that he understood that "as of . . . April 6, 2004, you were working for a new company, Tate & Lyle."). Ramige confirmed at his deposition that his basic duties and responsibilities performing all aspects of packaging engineering had not changed at the time Tate & Lyle acquired McNeil. *Id*. at 41. Ramige understood that he was working for a new company, and knew that management and the chain of command outside the facility had changed. Ramige Dep. at 37, 54, and 113.

16.     Ramige not only completed a new application for employment at Tate & Lyle but completed new benefits information and underwent orientation, including anti-discrimination and EEO training conducted by Mary Matiya, Director of Human Resources for Tate & Lyle, headquartered in Decatur, Illinois. Ramige Dep. at 48-49; Matiya Aff., ¶¶ 2, 8, and 11. This EEO training was conducted onsite, at which time Matiya disseminated Tate & Lyle's Policy Statement on Equal Opportunity, Non-Discrimination, Anti-Harassment and Professional Conduct to the new Tate & Lyle employees. Matiya Aff., Ex. "1". Ramige attended that training and acknowledged receipt of the Policy. *Id*. at Ex. "2". Ramige never suggested to Matiya or anyone with Tate & Lyle that he was disabled or unable to do his job in any way. Ramige Dep. at 46.

17.     After the acquisition, Ramige continued to perform all aspects of Packaging Engineer components. Ramige Dep. at 41. His general responsibilities did not change,

and he does not believe he ever asked for or needed any kind of assistance. *Id*. at 41and

43. Nor did he apply for disability or medical leave. *Id*. at 46. He had no problem

working beyond an 8-hour day, and no one at Tate & Lyle suggested that he needed

assistance to get the job done. *Id*. at 45-46. He was not disciplined, demoted or given

performance evaluations, and his compensation remained the same. *Id*. at 46-47 and 69;

Matiya Aff., ¶ 16.

18.     McNeil did not terminate Ramige. Ramige Dep. at 186-187. Ramige

specifically conceded that "McNeil was not the person who ordered someone to talk with

[me] about [my] termination and escort [me] from the building." *Id*. at 195. Ramige's

position as Packaging Engineer was eliminated as part of Tate & Lyle's continuing

reduction-in-force (RIF), effective May 31, 2004. Complaint, ¶ 8; Tate & Lyle Answer, ¶

9; Ramige Dep. at 24.[7] Following the acquisition, there were other jobs that Ramige was

qualified to do, but "[m]ost of them probably would have required a pay cut. . ." Ramige

Dep. at 23. Ramige has proffered no evidence that anyone, other than Austin Maguire,

Tate & Lyle's President, made the decision to eliminate Ramige's job as redundant under

Tate & Lyle's organizational structure and operating strategy. *Cf.,* Ramige Dep. at 88

---

[7]Ramige does not dispute that several positions were eliminated before Tate & Lyle even acquired the McIntosh facility, so that these employees never became Tate & Lyle employees. Matiya Aff. at ¶ 3. All of the quality assurance or "consumer side" positions were eliminated at the time of the sale. Nufrio Dep. at 32. Two employees in finance positions, Gary Foote and Angela Lejesse, were not rehired by Tate & Lyle because the Company has its finance areas centralized at its Decatur, Illinois headquarters. Matiya Aff.at ¶ 3. A third person, Janice Bequette, did not become a Tate & Lyle employee because her high level safety and health job was not one typically performed at a Tate & Lyle operating plant. *Id.* After the acquisition, the Company eliminated other redundant positions, including Ramige's Packaging Engineer job

(conceding that he has no evidence "that Karen Harris, Mike Young, and Rich Nufrio were involved in my termination" and that he had no "first hand knowledge" of where the final decision to eliminate his position was made), with Matiya Rebuttal Aff. at ¶¶ 3, 4 and 6.

19.     Ramige also conceded that he has no evidence that Austin Maguire knew anything about Ramige personally or considered either his age or his medical condition at the time he made the decision to eliminate Ramige's position.  Ramige Dep. at 96. According to Ramige, he never made any complaints about age or disability discrimination to anyone at Tate & Lyle.  *Id.* at 101.

20.     Maguire confirmed his decision to eliminate Plaintiff's position with Mary Matiya on April 22, 2004, at a time when she knew nothing of the particulars of Ramige's EEOC charge against McNeil.  Matiya Aff.at ¶ 9.  It was only after plans were already under way to eliminate  Ramige's position, on April 23, 2004, that it was brought to her attention by Karen Harris that Ramige had filed an EEOC charge against McNeil before Tate & Lyle acquired the facility.  Matiya Aff. at ¶ 9.  No details were known about this charge, and Ramige did not bring any separate charge against Tate & Lyle until July 19, 2004, after his job was eliminated in Tate & Lyle's continuing RIF.  *Id.*  Tate & Lyle did not receive this EEOC charge until August 9, 2004, so knew nothing about Ramige's specific allegations against Tate & Lyle until after that date.  *Id.*

21.     Ramige complains about the manner in which he was terminated, namely that on May 13, 2004, he "was ordered to leave the building and escorted to his cubicle

15

and out of the building [when] [n]o other employees were asked to leave the same day they received a package regarding the alleged reduction in force."  Opposition Brief (Doc. 46) at 8.   Ramige acknowledges, however, both that Tate & Lyle has maintained that he "was treated this way due to his . . . 'outburst' at his 2003 performance review"and that "at the discussion of the review things became heated." [8]  Opposition Brief (Doc. 46) at 8; Opposition Brief (Doc. 45) at 10-11.  Ramige has proffered no evidence that any other employee ever acted in a similar manner with his/her supervisor in conjunction with an annual performance review, which is obviously of less impact than news that one's position has been eliminated as redundant.[9]

22.   Ramige also complains that Jennifer Moses and Joe Weber, who had been employed by McNeil in customer service and whose jobs were eliminated by Tate & Lyle, "were both offered jobs by Tate & Lyle in the packaging department."  Opposition Brief (Doc. 46) at 8.   As stated previously, however, Ramige acknowledges that, following the acquisition by Tate & Lyle, there were other jobs that Ramige was qualified

---

[8]The Court has stricken the word "alleged" from this quote by Ramige inasmuch as Ramige has conceded that the outburst occurred.  *See e.g.*, Opposition Brief (Doc. 45) at 10-11 (conceding that "[a]t the discussion of the review things became heated . . . [and] both Nufrio and Ramige used profanity.").

[9]To the extent Ramige questions Tate & Lyle's "knowledge of all other actions by Ramige while he was employed at McNeil" based solely on Tate & Lyle's "knowledge of Ramige's outburst," such apparent disdain does not constitute evidence of discrimination or retaliation. Opposition Brief (Doc. 46) at 8.  The fact that Harris, Young and Nufrio were all acutely aware of Ramige's previous outburst does not alter the fact that there exists no evidence that Harris, Young or Nufrio, or anyone other than Austin Maguire, participated in the decision to eliminate Ramige's position or that Maguire had any personal knowledge about Ramige and his performance/conduct prior to the takeover and the RIF decisions.

to do, but "[m]ost of them probably would have required a pay cut. . ." Ramige Dep. at 23.  Ramige does not contend that he requested any other position, only that no other position "was offered to Ramige."  Opposition Brief (Doc. 46) at 9.  According to Nufrio, as acknowledged by Ramige, both Moses and Weber approached him requesting "any way they c[ould] stay on with [Tate & Lyle]."  *Id*. at 10, *citing* Nufrio Dep. at 40. Tate & Lyle confirm that, if there were other, comparable positions available at the facility, they tried to move affected persons into them, if they requested.  Moses and Weber were able to take on other, mid-level positions, after they approached Tate & Lyle about wanting to remain employed at the facility.  Matiya Aff. at ¶ 13.  Joe Weber is now a Warehouse Coordinator.  Nufrio Dep. at 19.  Moses is a Project Coordinator for finishing packaging who receives lower compensation and is otherwise differently situated from Plaintiff.  *Id*. at 18-19.  No fit was available for Ramige, however, even assuming that he had asked Tate & Lyle to try to transition him into another available position, which he did not.  *Id*. "He had a higher, better compensated position as Packaging Engineer, and, after he was terminated, this position simply no longer existed at this facility, and there was no other, comparable position available for him."  *Id*. Subsequent to Ramige's termination, the RIF continued.  Mark Wyatt, an Analyst, whose date of birth is March 15, 1974, was terminated effective June 30, 2004.  Matiya Aff. at ¶ 15.  Wyatt's job was also redundant within Tate & Lyle.  Nufrio Dep. at 32.

   23.  Ramige does contend that "[s]ubsequent to his termination by Tate & Lyle [he] contacted J & J to seek employment."  Opposition Brief (Doc. 45) at 13.  Ramige

argues that he "did not receive a job from McNeil or J & J [after he] applied for several packaging engineering jobs for which he was well qualified."  *Id*.  However, the evidence of record establishes as follows:

      (1)     McNeil Consumer & Specialty Pharmaceuticals posted an employment listing on about May 21, 2004 and again on July 9, 2004 seeking applicants for a Packaging Equipment Project Manager.  A Green Belt Certification in Process Excellence combined with graduate level academic courses applicable to a Master's Degree in Engineering, Business Management, or Project Management was desired.  Ramige submitted a resume and responded to an online questionnaire about the opening on July 28, 2004.  Ramige's answers to the questionnaire indicated that he did not have a Green Belt Certification in Process Excellence or a Master's degree which at least one other applicant did possess.  Consequently, Ramige did not move forward in the interview process.  Pulli Aff. (Doc. 51) at ¶¶ 3-8.

      (2)     Ethicon, Inc. posted an opening for the position of Industrial Engineer for which Ramige submitted on August 26, 2004, his resume and answers the employment questionnaire.  A total of thirty-six (36) applicants did the same.  The questionnaire contained six questions related to minimum skills required for the position and ten questions related to "assets particularly suited for the particular position."  Carter Aff. (Doc. 51) at ¶ 8.

Ramige "satisfied only four of the minimum requirements [and] failed to meet any of the preferred assets." *Id.*

(3)     Cordis Corporation posted an opening for a staff engineer position entitled Packaging Engineer in Technical Operations.  Thirty-two (32) applicants responded, including Ramige who electronically submitted his resume and questionnaire responses on July 28, 2004.  Although Ramige met minimum requirements for this position and was interviewed along with two others, the person ultimately selected had work experience at another Cordis facility in Europe and had specific experience with the product manufactured at this Cordis facility, namely Cypher Stent.  Ferreira Aff. (Doc. 51) at ¶¶6-8.

(4).    LifeScan, Inc. posted a listing for a Packaging Engineering Manager on about March 16, 2004.  Ramige filed his application on July 28, 2004, after another applicant had been interviewed and selected for the position but had simply not yet accepted the offer made by LifeScan.  The chosen applicant ultimately accepted the job shortly after Ramige submitted his application.  Padgett  Aff. (Doc. 51) at ¶¶ 6-9.

(5).    Noramco, Inc. posted an opening for a Staff Engineer position to both internal and external candidates.  Ramige submitted his resume and questionnaire responses on about October 19, 2004, one of 262 candidates.  Ramige did not meet the minimum requirements for this position inasmuch

19

as he answered the question regarding medical device experience in the

negative, and thus was not presented to the hiring manager and was not

selected for an interview.  Luther Aff. (Doc. 51) at ¶¶ 6-9.

This evidence has been submitted in rebuttal to Ramige's opposition response to

summary judgment.  Ramige has, however, failed in his own obligation to proffer any

evidence to substantiate his merely general statement he had applied for "packaging

engineering jobs for which he was well qualified."   Opposition Brief (Doc. 45) at 13.

More importantly, Ramige has failed to proffer any evidence that he was rejected for any

of the positions he sought because of his age or perceived disability.  In point of fact, he

has presented no information at all about either the identity of the decision maker or

successful candidate for any of the alleged positions for which he submitted an

application but was rejected.[10]

---

[10]Ramige attempts to implicate Jenny Hassell, Director of Career Services at Johnson &
Johnson Career Corporate Services ("Career Services"), is unavailing.  The evidence simply
refutes any nexus between Hassell's request for Ramige's last performance rating at McNeil (an
obviously appropriate inquiry) and the failure of unidentified decision-makers to appoint Ramige
to positions for which he independently submitted applications.  Ramige has specifically failed
to refute the evidence that Hassell's role with Career Services was "to assist[] both active and
displaced employees in identifying opportunities *external* to Johnson & Johnson via licensed
databases of on line job opportunities" but that "Ramige indicated to me his desire to locate
employment *internally* within Johnson & Johnson, and did not choose to expand his search
externally," which required Ramige to "utilize Career Connections or JNJ.com."  Hassell Aff.
(Doc. 39-3), Exh. 16 at ¶¶ 3-4. Hassell also explained to Ramige "that Career Services and J&J
Recruiting are two separate functions, and that Career Services does not regularly play an
intermediary role in an employee's bid for internal employment.  *Id*. at ¶ 4.  Ramige does not
dispute that he had no further communication with Hassell after August 16, 2004.  *Id*. at ¶ 5.

24.     Ramige also complains that, during his employment with McNeil, he was denied the opportunity to complete a Masters of Packaging Science degree at Rochester Institute of Technology ("RIT").  Opposition Brief (Doc. 45) at 4; Exh. D, doc. 000110. Ramige contends that he communicated his desire to Nufrio and Sorg in February of 2001 and was initially approved but he then acknowledges that all moneys for training were thereafter put on hold by John Kirshner, the interim Plant Manager.  *Id.*  Ramige then contends that on May 6, 2002, following his return to work from medical leave, he renewed his request by email to Nufrio, Sorg and the then Plant Manager, Mike Young, but was told during his evaluation on May 7, 2002 that he would not receive help with continuing education at RIT due to his poor performance.  *Id.* at 8; Exh. C, doc. 000194. Not only is this claim clearly barred by the applicable statute of limitations, but Ramige has proffered no evidence that any other employee similarly situated was denied tuition reimbursement benefits.  In addition, Ramige's communications regarding his attendance at RIT contain specific acknowledgment that "the tuition requirement for this program may not entirely fit [McNeil's] current 'tuition reimbursement' program."  Opposition Brief (Doc. 45) at 4; Exh. D, doc. 000192.  And, for the reasons previously stated, Ramige has failed to proffer evidence that his performance ratings were the result of discrimination either on the basis of age or perceived disability.

25.     Ramige complains that his raises were determined by the numerical rating on the performance evaluations and that he thus received: "a 4% raise in 2000, a 4.12% raise in 2001, a 3.9% raise in 2002, a 2.79% raise in 2003, and a 2.1% raise in 2004."

Opposition Brief (Doc. 45) at 14.  Ramige has again failed to proffer any evidence that

similarly situated individuals who were younger than he or not perceived to be disabled

were treated any differently with respect to annual raises or bonuses. And, for the reasons

previously stated, Ramige has again failed to proffer evidence that his performance

ratings were the result of discrimination either on the basis of age or perceived disability.

26.     Although Ramige argues that Tate & Lyle were on notice as to the EEOC

complaint he filed against McNeil simply because the complaint was sent to McNeil at

the McIntosh facility, Ramige has proffered no evidence that the EEOC complaint was

actually read by any official of Tate & Lyle prior to being faxed to McNeil.  The EEOC

complaint was not asserted against Tate & Lyle.

## CONCLUSIONS OF LAW

1.   **Summary Judgment Standard**

Defendants are entitled to summary judgment "if the pleadings, depositions,

answers to interrogatories and . . . affidavits . . . show that there is no **genuine** issue as to

any **material** fact and that [the defendants are] entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c)  (emphasis added).  Under Rule 56(c):

> A factual dispute is "genuine" if the evidence is such that a
> reasonable jury could return a verdict for the non-moving
> party.  A fact is "material" if it might affect the outcome of
> the suit under governing substantive law.

*Beck v. Somerset Technologies, Inc.,* 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Where the record taken as a whole could

not lead a rational trier of fact to find for [the plaintiffs], there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the plaintiff fails to produce sufficient evidence to raise a genuine issue of material fact on the existence of an essential element of their claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986*); Manor Healthcare Corp. V. Lomelo,* 929 F.2d 633, 636 (11th Cir. 1991). In considering defendants' motions for summary judgment, the Court views the facts presented, together with all reasonable inferences arising from the facts, in the light most favorable to the plaintiff. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Cooper v. Southern Co.*, 390 F.3d 695, 723 (11th Cir. 2004). As the moving party, the defendants have the initial burden of showing the absence of a genuine issue of material fact. *Id.* Once the defendants make that showing, the burden shifts to the plaintiff to "come forward with *specific* facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (1986). Confronted with a properly supported motion for summary judgment, the plaintiff must adduce admissible evidence which creates a material factual dispute. *Clarke v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Plaintiff must do more than "simply show there is some metaphysical doubt as to the material facts." *Anderson,* 477 U.S. at 251-52. He must produce evidence. *Id.*

### 2.   Statute of Limitations

In *National RR Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), the Supreme Court ruled that "discrete discriminatory acts are not actionable if time barred,

even when they are related to acts alleged in timely filed charges." *See also, Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1180 (11th Cir. 2005) (acts of discrimination affecting plaintiff's salary before EEOC limitations period are time-barred, and plaintiff's claims are confined to discriminatory acts affecting her pay during that period). In Alabama, a charge must be filed within 180 days of the last discriminatory act. *See Wilkerson v. Grinnell Corp.,* 270 F.3d 1314, 1317 (11th Cir. 2001). Ramige filed his EEOC claim on March 29, 2004. The statute of limitations bars any claim related to any purportedly adverse action occurring before October 1, 2003. Ramige's contention that he "has alleged a serious of acts that collectively constitute one act" is not only without foundation but specious. Opposition Brief (Doc. 45) at 24. As unhappy as Ramige has been with each evaluation since his return from bypass surgery and certain other discrete acts of alleged discrimination, he has not alleged or established a hostile environment claim that would alter the applicable statute of limitations in this case.

### 3. Age Discrimination Claim

Ramige has failed to either assert any argument or proffer any evidence in support of his age discrimination claim under the Age Discrimination Act (ADEA), 29 U.S.C. § 621, *et seq.*, against either McNeil or Tate & Lyle. Consequently, the Court must deem such claims to have been abandoned following the submission of defendants' respective motions for summary judgment. Defendants are, therefore, entitled to summary judgment on the age discrimination claims.

24

### 4. __Perceived Disability Claim__

As Ramige accurately points out in the outset of his legal conclusions regarding his perceived disability claim, "[t]he ADA defines disability as '(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment'." Opposition Brief (Doc. 45) at 14, *citing*, 42 U.S.C. § 12102(2). Ramige also correctly sets forth the applicable regulations which "explain that a person is 'regarded as' having a disability if he meets any one of the following descriptions: he has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation; he has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; or he has no physical or mental impairment but is treated by an employer as having such an impairment." *Id.*, *citing*, 29 C.F.R. § 1630.2(l). Although not referenced by Ramige, the regulations further define "major life activities as: "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I). The regulations also define the term "substantially limit" to mean:

> (I) Unable to perform a major life activity that the average person in the general population can perform; or

> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the

average person in the general population can perform that same
major life activity.

29 C.F.R. § 1630.2(j)(1).  In determining whether an individual is substantially limited in

a major life activity, the regulations direct consideration of the following factors:

> (I) The nature and severity of the impairment;
>
> (ii) The duration or expected duration of the impairment; and
>
> (iii) The permanent or long term impact, or the expected permanent
> or long term impact of or resulting from the impairment.

*Id*. at subsection (2).  The regulations also provide in pertinent part that, with respect to

the major life activity of working:

> (I) The term substantially limits means significantly restricted in the
> ability to perform either a class of jobs or a broad range of jobs in
> various classes as compared to the average person having
> comparable training, skills and abilities. **The inability to perform a
> single, particular job does not constitute a substantial limitation
> in the major life activity of working.**

*Id*. at subsection (3)(I) (emphasis added).

Despite the above clear edicts of the federal regulations concerning Ramige's

ADA claim, he argues only that "after he underwent quadruple bypass surgery and

returned to work he was treated as unable to perform his job **up to the expectations of**

**his employer**."[11]  Opposition Brief (Doc. 45) at 14-15 (emphasis added).  Ramige has

---

[11]Ramige similarly argues that "[a] reasonable jury could conclude Nufrio regarded
Ramige as **deficient in hi[s] performance and unable to meet 'the expected contributions
from this position'.**"  Opposition Brief (Doc. 45) at 16.  Such again reflects only a perception
about Ramige's level of performance and not the ability to perform.  A reasonable jury could not
conclude, based upon the evidence proffered by Ramige, that Nufrio perceived Ramige to be
substantially limited in any major life activity within the meaning of the ADA.

proffered no evidence that Nufrio, the only individual he contends perceived him as being disabled, actually regarded him as being "substantially limited"in his ability to perform any major life activity, including his particular job as packaging engineer. An examination of each challenged performance evaluation prepared by Nufrio establishes on its face that Nufrio did not question Ramige's ability to perform but merely the level of his performance, ranking Ramige at a level ranked "4" which undisputedly equates with "performance that has generally achieved job standards."Opposition Brief (Doc. 45) at Exh. B, doc. 000214. Ramige has, therefore, failed to establish a *prima facie* case that he was regarded by McNeil as disabled in violation of the ADA.

The evidence Ramige describes as illustrating that he was "regarded as" having a disability fails because it does not prove a perception of disability "within the meaning of the ADA." *Phillips v. Wal-Mart Stores, Inc.*, 79 F. Supp. 2d 1274, 1288 (S.D. Ala. 1999). In *Phillips*, the district court concluded that no evidence existed that the employer perceived impairments as substantially limiting any of the employee's major life activities. 78 F. Supp. 2d at 1288. Phillips, as is true in this case with Ramige, relied on his allegation that his supervisors treated him harshly, but failed to show that either of the supervisors did so because they perceived him as disabled. *Id.* As is also true in this case, the Phillips' court concluded that "[t]o the contrary, Phillips' supervisors recognized that he could perform his job duties and, as was shown through evaluations, written coachings and other evidence in the record, they insisted that he do so." *Id.*

27

In *Roberts v. Rayonier, Inc.*, 135 Fed. Appx. 351, 2005 WL 1412066, *5 (11th Cir. June 16, 2005), plaintiff claimed that his employer regarded him as disabled due to his alcoholism.  The court concluded, however, that "[f]ar from treating him as unable to perform his job, or severely restricted in his job, Rayonier expressly allowed Roberts to continue."  *Id.*  The court further noted that Roberts' own work history indicated that he was not disabled where he had held the job for a number of years, earned salary increases every year, received an "acceptable" rating, and received a raise and bonus in his final year in the job.  *Id.*   As in *Phillips* and *Roberts*, there is simply no proof that Nufrio, or anyone else at McNeil regarded Ramige as physically unable, or even substantially limited in his ability, to act as a packaging engineer or any other job.

Although Ramige asserts generally in the introduction of his opposition brief against Tate & Lyle that he "has alleged that Defendant Tate & Lyle, Inc. (hereinafter "Tate") discriminated against him due to his age and disability and ultimately terminated him due to his age and/or disability," he fails to present any argument or evidence relative to this claim but, instead, argues only that he was terminated "in retaliation for protected conduct."  *Cf.*, Opposition Brief (Doc. 46) at 1 with *Id.* at 11-19.  Consequently, the Court must deem such ADA claim against Tate & Lyle to have been abandoned following the submission of the defendants' respective motions for summary judgment.  Tate & Layle is, therefore, entitled to summary judgment on the disability discrimination claim.

28

### 5.    Retaliation Claim

As Ramige accurately points out in the outset of his legal conclusions regarding

his retaliations claims, "to establish a *prima facie* case for retaliation he must show (1) he

engaged in statutorily protected expression; (2) he suffered an adverse employment

action; and (3) the adverse action was causally related to the protected activity."

Opposition Brief (Doc. 45) at 19-20, *citing*, *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d

1453, 1454 (11th Cir. 1998).  With respect to Ramige's retaliation claim:

> The framework for analyzing retaliation claims under the ADA
> is similar to that set forth in *McDonnell Douglas Corp. v. Green*,
> 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668
> (1973).  The plaintiff must first establish a prima-facie case of
> retaliation.  This prima-facie case has three elements: (1) the
> plaintiff must have engaged in statutorily protected activity; (2)
> the plaintiff must have suffered an adverse-employment action;
> and (3) there must be a causal link between the adverse action
> and the protected activity. *Williams v. Motorola*, 303 F.3d 1284,
> 1291 (11th Cir. 2002).
>
> Once the plaintiff establishes a prima-facie case of retaliation,
> an inference arises that illegal discrimination occurred.  It is then
> up to the employer to articulate a legitimate, nondiscriminatory
> reason for the adverse-employment actions taken.   If the
> employer successfully does so, the burden shifts back to the
> plaintiff to show that the proffered reason is pretextual. *Farley
> v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1333 (11th Cir.
> 1999).

*Reinhart v. Shaner*, 2004 WL 419911, at *5 (M.D. Ala. Feb. 9, 2004); *Weeks v. Harden Mfg.*

*Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (adopting the same analysis in ADEA context).

26.

According to Ramige, he first "formally complained" about discrimination in his memo to Sorg and Nufrio on March 12, 2003, and that "all actions taken after March 12, 2003 can be considered in his retaliation claim."  Opposition Brief (Doc. 45) at 20).  As stated in the Court's findings, however, no reasonable juror upon review of this memo could find that Ramige had made any complaint about being perceived by Nufrio to be disabled or incapable of performing his job as opposed to finding that Ramige simply disagreed with Nufrio's perception of the level of his performance during 2002. Consequently, the 1% reduction in his 2003 bonus following the performance review about which Ramige complained on March 12, 2003, does not constitute evidence of retaliation related to any protected activity, particularly in light of Ramige's concession that the reduction related to an inappropriate email he sent while on disability leave.[12]

It is undisputed that Ramige did make a complaint to the compliance line of J&J. McNeil's parent corporation following his 2003 performance review dated February 17, 2004 and conducted in March of 2004.  No specific date was provided by Ramige relative to this complaint other than the fact that it was investigated by Carol Peccarelli who was identified as "Vice President, Human Resources, McNeil Nutritionals," and her report

---

[12]Even if it could be said that Ramige established a *prima facie* case with respect to the 1% reduction in his 2003 bonus, Ramige has clearly failed to establish that the non-discriminatory reason given by McNeil for this reduction, namely Ramige's "poor judgment and unprofessional behavior demonstrated in an inappropriate e-mail Ramige forwarded to five co-workers, including college co-op students on February 16, 2002, while he was on short-term disability," was a pretext for discrimination.

issued on April 6, 2004.[13]   Ramige does not contend that this complaint was made prior

to his meeting with Harris the day after his performance review when she confronted him

about his behavior during the review and forewarned him that disciplinary action would

be taken.  It is therefore irrelevant that the written reprimand for using profanity during

his performance review, a fact not disputed by Ramige although he attempts to excuse it

by claiming like behavior by his supervisor, was not actually delivered to Ramige until

March 15, 2004.  This written reprimand does not, under these circumstances, constitute

evidence of retaliation.[14]   Nor does the fact that the percentage raise for 2004 given to

Ramige following the performance review of 2003 was a mere  .69% less than the

percentage increase he received for 2003.[15]

Ramige filed a formal EEOC complaint against McNeil Nutritionals on March 29,

2004.  Notice of this charge was not sent to McNeil by the EEOC until April 20, 2004,

and then it was misdirected to McNeil at the McIntosh plant which had earlier been taken

over by Tate & Lyle.  This charge was faxed the same day it was received by Tate & Lyle

---

[13] There is evidence that this complaint, entitled an Alertline Confidential Memorandum, was made on March 4, 2004 at 11:07 am.  *See*, McNeil Reply (Doc. 51) at Exh. 1, doc. 000129.

[14]The written reprimand advised Ramige that the language he used in this meeting was "unacceptable, unprofessional and clearly inappropriate." Opposition Brief (Doc. 49) at 15, doc. 000081. Ramige was given a written warning because of his violation of a "Group 1 Work Rule," which constitutes "misconduct that violates common decency and is generally disruptive or offensive to fellow associates including but not limited  . . . verbal abuse." *Id*. The Report also referenced the previous instance when Ramige was "previously advised about this type language in reference to the February 2002 e-mail [he] sent from home to co-workers." *Id*.

[15]According to Ramige, he received a 2.79% raise for 2003 and only a 2.1% raise for 2004.  Opposition Brief (Doc. 45) at doc. 000121.

to McNeil.  There is no evidence that Tate & Lyle read the charge beyond the section identifying the intended recipient as McNeil.

The only retaliation conduct specifically asserted by Ramige relative to his formal EEOC complaint relates to McNeil and the denial of his request for appointment to an opening at the Alza Corporation, another subsidiary of J&J, following an email he sent to Harris, Nufrio and Peccarelli on March 30, 2004, in which he also informs them that he filed a formal EEOC charge on March 29, 2004.  As stated above, however, the email in question merely informed the recipients about his alleged application for the Alza opening while simultaneously acknowledging that "all opportunities within J&J are on hold during this transition and for some time in the future."  Opposition Brief (Doc. 49) at Exh. D., doc. 000155.  As further stated above, Ramige has also failed to dispute the evidence that he was not qualified for the subject position and has failed to proffer evidence that the recipients of the email either had any authority to appoint him to the subject position or in any manner participated in the selection process.

To the extent that Ramige also considers his failed attempts to seek re-employment with J&J and McNeil after he sought and gained employment with Tate & Lyle on April 4, 2004, as acts of retaliation, he has failed to proffer evidence to support his merely general assertion that he had applied for "packaging engineering jobs for which he was well qualified."  There is certainly no evidence in the record to support Ramige's suspicion that either his filing of an EEOC charge or any performance evaluation rating was at the root any denial of a job opportunity.

It is undisputed that Tate & Lyle terminated Ramige's employment.  Although Ramige asserts that "he was retaliated against by Tate & Lyle **based upon his assertion of discrimination claims against Nufrio, Harris and Young while he was an employee at McNeil**," he has proffered no evidence that Nufrio, Harris and/or Young were involved in his termination or that anyone other than Austin Maguire, President of Tate & Lyle, made the decision to eliminate Ramige's job as redundant under Tate & Layle's organizational structure and operating strategy.   There is no evidence that Austin Maguire was aware of any discrimination complaints being made by Ramige.  In point of fact, there is no evidence that Maguire knew anything about Ramige personally or considered either his age or his medical condition at the time he made the decision to eliminate Ramige's position.  Ramige concedes that he has never made any complaints about age or disability discrimination to anyone at Tate & Lyle.

In the instant case, Ramige has failed to establish two essential elements of his *prima facie* case of retaliation against Tate & Lyle.  He made no complaint while under Tate & Lyle's employment, but, even if he had, there could be no causal relation between his termination and any such complaint.  The admissible, undisputed evidence shows that Ramige's job was eliminated as part of Tate & Lyle's bona fide, continuing reduction-in-force and that this decision was put in motion even before Tate & Lyle acquired the facility, much less before its decisionmaker had knowledge of Ramige's complaint against McNeil.  To establish the causal connection element of a retaliation claim, Ramige must "show that the decision maker was aware of the protected conduct **at the**

33

**time of the adverse employment action**."  *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)(emphasis added). "A decision maker cannot have been motivated to retaliate by something unknown to him."  *Id.  See also*, *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1156 (11th Cir. 2002)(coincidence in timing is not sufficient to show causality where unrebutted testimony was that supervisor lacked knowledge of protected activity and therefore could not have retaliated against employee for it); *Zhuang v. Datacard Corp.,* 414 F.3d 849, 857 (8th Cir. 2005) (rejecting mere temporal proximity as sufficient evidence of causality where the only possible evidence of a causal relationship was the decisionmaker's acknowledgement of plaintiff's EEOC charge; in the absence of any evidence of discussion marked by retaliatory animus, . . . "any finding of retaliation would necessarily be based upon mere conjecture and would amount to a determination that an employee can insulate [himself] from an otherwise valid termination by filing an EEOC complaint.")(summary judgment affirmed); *Roberson v. Alltel Info. Servs*., 373 F.3d 647, 655-56 (5th Cir. 2004)(the fact that RIF occurs after an employee files a discrimination complaint is insufficient evidence of retaliation)(summary judgment affirmed); *Contreras v. Suncast Corp*., 237 F.3d 756, 765 (7th Cir. 2001)(plaintiff's discharge one month after EEOC charge was insufficient alone to show causation and survive summary judgment)(affirming summary judgment on retaliation and disability claims); *Cecilio v. Allstate Ins. Co.,* 908 F. Supp. 519, 532 (N.D. Ill. 1995) (a showing that adverse action was taken after complaints of discrimination is

not enough to make out *prima facie* case of retaliation, let alone to survive summary judgment).

It is not, sufficient, therefore, for Ramige to make the naked assertion that Tate & Lyle's decisionmaker "likely" knew about his McNeil EEOC charge, even assuming that a charge **against McNeil** would constitute protected activity sufficient to hold Tate & Lyle liable.  *See Hayden v. Atlanta Newspapers*, 534 F. Supp. 1166, 1175 (N.D. Ga. 1982) (granting summary judgment where plaintiff alleged that it was "logical" to assume that the person who took adverse action had knowledge of protected activity).  The Court agrees that such assertion will not "connect the dots." *Woodman v. WWOR-TV, Inc*., 411 F.3d 69, 85, 87-88 (2d Cir. 2005)(terminated plaintiff's contention that defendants "must have" reviewed documents of her former employer upon merger containing age-specific information amounted to speculation and conjecture which was inadequate to defeat motion for summary judgment; furthermore, plaintiff was obliged to do more than produce evidence that someone at the acquiring company knew her age; she was obliged to offer evidence indicating that persons who actually participated in her termination decision had such knowledge)(affirming summary judgment); *Noble v. Brinker Int'l., Inc*., 391 F.3d 715, 724 (6th Cir. 2004)(plaintiff's speculation that prior manager's contaminated perception of him must have been transmitted to his new manager, the ultimate decisionmaker, could not satisfy his burden of proving that the new manager discharged him on account of race).

Nor would it be sufficient if Ramige could demonstrate that Tate & Lyle subsequently gained knowledge about the allegations of his McNeil EEOC charge at some point before the final decision.[16]  *See e.g., Brackman v. Fauquier County, Virginia*, 2003 WL 21541040, at *6 (4th Cir. July 9, 2003)(summary judgment affirmed where decisionmaker lacked knowledge about plaintiff's EEOC charge during initial discussions about the elimination of his position during a reduction-in-force but had gained knowledge by the time the final decision to eliminate that position was made).  Rather, **actual knowledge** by the decisionmaker at the time is required: "In order to satisfy the 'causal link' prong of a prima facie retaliation case, [plaintiff] must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action."  *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997); *Embry v. Callahan Eye Found. Hospital*, 147 Fed. Appx. 819, 831 (11th Cir. Aug. 23, 2005).  No such proof exists here.

Austin Maguire made this decision, with Rich Nufrio supplying **no** input, or even having talked to Maguire at the time.  Maguire knew nothing about Ramige, including his age or his alleged disabilities; he was interested only in examining his Packaging Engineer **position** and whether that position was redundant under Tate & Lyle's centralized model, as it so clearly was.  *See,* Young Aff. at ¶ 7); *Davis v. Con-Way*

---

[16]Plaintiff has not made such a demonstration, however, and the admissible evidence shows that Tate & Lyle knew no details whatsoever about the McNeil charge until after the decision had been made to eliminate his job as part of the RIF.  Matiya Aff. at ¶ 9.

*Transp. Central Express, Inc.*, 368 F.3d 776, 786 (7th Cir. 2004)(affirming summary judgment where actual decisionmaker did not know plaintiff's race at the time he formed his initial impression that plaintiff's position was one the company could do without).

Even so, Ramige's retaliation claim otherwise fails for lack of substantial evidence that the legitimate, nondiscriminatory reason for his inclusion in this RIF, the redundancy of his position, was a pretext.  As explained in *Clay v. Holy Cross Hospital*, 253 F.3d 1000 (7th Cir. 2001):

> Pretext 'means a dishonest explanation, a lie rather than an oddity or an error.'  'A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; **'pretext' means deceit used to cover one's tracks**.'  'On the issue of pretext, our only concern is the honesty of the employer's explanation.'

*Clay*, 253 F.3d at 1005 (citations omitted)(emphasis added).  Thus, an employer's reasons can be "mistaken, ill considered or foolish," but so long as an employer honestly believes those reasons, pretext has not been shown.  253 F.3d at 1005-06.

Ramige acknowledges that a RIF no doubt occurred after this acquisition, but asserts that the elimination of his position at the facility was still just an excuse to fire him.  Ramige Dep. at 87.  As pretext evidence, he claims that Jennifer Moses picked up his packaging engineering duties, although he concedes she does not have his title, receives a lower salary, and performs only **some** of his former duties.  *Id*. at 90.  In this regard, it is not disputed that evidence of more favorable treatment of similarly situated employees outside of a plaintiff's class can be relevant to a showing of pretext.  Here, however, any such showing is

overwhelmingly overcome by the facts that (1) this was a true workforce reduction; and, (2) Moses is not similarly situated to Plaintiff.

As explained in *Barnes v. GenCorp, Inc., supra:*

> It is important to clarify what constitutes a true work force reduction case. A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or his discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another person is hired or reassigned to perform the plaintiff's duties.

*Barnes*, 896 F.2d at 1465. In addition, "[t]o show that employees are similarly situated, the plaintiff must show that the 'employees are similarly situated in *all relevant respects*.'" *Embry*, 147 Fed. Appx. at 829. "Indeed, the comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Id*.

As discussed above, Moses is not similarly situated to Ramige because he held the only Packaging Engineer position in this facility, was compensated at a significantly higher rate, and unlike Moses, failed to come forward to request other, mid-level employment. Ramige, therefore, has done no more than simply quarrel with his former employer's wisdom, and his claims are due to be dismissed. As stated in *Chapman v. AI Transport,* 229 F.3d 1012 (11th Cir. 2000):

> A plaintiff is not allowed to recast an employer's proffered non-discriminatory reasons or substitute his business judgment for

that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the **employee cannot succeed by simply quarreling with the wisdom of that reason**.  *See Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1341 (11th Cir. 2000) (Title VII case) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated"); *Combs*, 106 F.3d at 1541-43.  We have recognized previously and we reiterate today that:

> **[f]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.**  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers . . . our inquiry is limited to whether the employer gave an honest explanation of its behavior.'

229 F.3d at 1030 (emphasis added).

Even if Ramige had established a *prima facie* case and evidence of pretext, however, his claims against Tate & Lyle still fail.  Ramige has proffered "virtually no evidence of discriminatory intent."  *See Wascura v. City of S. Miami,* 257 F.3d 1238, 1246 (11th Cir. 2001) (affirming summary judgment); *Sonnier v. Computer Programs & Sys., Inc.*, 168 F. Supp. 2d 1322, 1332 (S.D. Ala. 2001)("An employee's subjective belief of discrimination alone is not sufficient to warrant judicial relief.")(summary judgment granted); *Zapata-Matos v. Reckitt & Colman, Inc.,* 277 F.3d 40, 45 (1st Cir. 2002)(*C.J. Kravitch,* Eleventh Circuit, sitting by designation)("*Reeves* reinforced the prior law in this circuit that even if the trier of fact disbelieves the nondiscriminatory explanation given by the employer, the trier is not compelled to find that the real reason was discrimination. . . .**the ultimate question is not**

**whether the explanation was false, but whether discrimination was the cause of the termination**.")(emphasis added).

Finally, Tate & Lyle is also entitled to summary judgment on the additional ground that Ramige failed to dispute that Maguire would have made the same decision to terminate him even absent alleged discrimination. *Steger v. General Elec. Co.*, 318 F.3d 1066, 1075-76 (11th Cir. 2003); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 2001); *Lewis v. Young Men's Christian Ass'n*, 208 F.3d 1303, 1306 (11th Cir. 2000); *see also Roberts v. Rayonier, Inc.*, 135 Fed. Appx. 351, 358-59 (11th Cir. 2005)(analyzing same decision defense in ADA retaliation case).    Where an employer demonstrates by a preponderance of the evidence that its legitimate reason for terminating an employee, standing alone, would have induced the same decision, that employer may avoid liability altogether.  *See Steger*, 318 F.3d at 1075-76; *Pennington*, 261 F.3d at 1268-69.

This "same decision" defense is sufficiently supported by evidence illustrating a RIF pursuant to a reorganization, particularly where, as here, the decisionmaker had no knowledge of the plaintiff's complaints. *See Steger,* 318 F.3d at 1076-77 (evidence sufficient to support "same decision" defense where employer demonstrated that employee's layoff resulted from economic necessity, the reorganization of departments, and a comparison of the employee's performance with that of her coworkers); *Pennington*, 261 F.3d at 1269-70 (affirming summary judgment and relying on the decision of an impartial ultimate decisionmaker to conclude the same decision would have been made regardless of subordinate's possible bias).   In this case, there is sufficient evidence demonstrating that

Tate & Lyle's centralization of operations after the acquisition, standing alone, reasonably induced the decision to terminate Ramige.

## CONCLUSION AND ORDER

For the reasons stated above, the Court concludes that there exists no issue of material fact and defendants are each entitled to summary judgment as a matter of law with respect to each of plaintiff's claims.  It is therefore **ORDERED** that defendants' respective motions for summary judgment be and are hereby **GRANTED** and that **JUDGMENT** be entered in favor of the defendants, McNeil Nutritionals, LLC and Tate & Lyle, Inc., and against the plaintiff, Robert Ramige, the plaintiff to have and recover nothing of the defendants.  Costs are taxed against the plaintiff.

**DONE** this 29th day of September, 2006.

     s/ W. B. Hand     
SENIOR DISTRICT JUDGE
